# STATE OF MICHIGAN

# COURT OF APPEALS

ADENA TULLAR, DENISE FORD and GLORIA
CHATMAN,

UNPUBLISHED
October 4, 2016

Plaintiffs-Appellants,

v

No. 327093
Genesee Circuit Court
LC No. 13-101729-CZ

FLINT HOUSING COMMISSION, TERRENCE
CLARK, CHRISTIONNE REID and PAULETTE
WAZNY,

Defendants-Appellees.

Before: K. F. KELLY, P.J., and M. J. KELLY and RONAYNE KRAUSE, JJ.

PER CURIAM.

In this wrongful termination case, plaintiffs appeal by right the trial court's grant of summary disposition in favor of defendants. Plaintiffs were employed by defendant Flint Housing Commission (FHC) in administrative roles. They were terminated after anomalies in the file of a tenant, Christopher Coleman, who is plaintiff Ford's brother, came to the attention of defendant Clark, the FHC's executive director, who ordered an independent investigation. The investigation concluded that plaintiffs had engaged in serious misconduct regarding the Coleman file, whereupon Clark terminated them. Plaintiffs contend that they were terminated because they engaged in protected activities under the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq.*, and that they were discriminated and retaliated against under the Civil Rights Act (CRA), MCL 37.2201 *et seq.* We affirm.

A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When reviewing a motion under MCR 2.116(C)(10), which tests the factual sufficiency of the complaint, this Court considers all evidence submitted by the parties in the light most favorable to the non-moving party and grants summary disposition only where the evidence fails to establish a genuine issue regarding any material fact. *Id*. at 120. The courts should generally be liberal in finding genuine questions of fact. *Jimkoski v Shupe*, 282 Mich App 1, 5; 763 NW2d 1 (2008). The trial court's determinations of law are also reviewed de novo. *Herald Co, Inc v Eastern Mich Univ Bd of Regents*, 475 Mich 463, 471-472; 719 NW2d 19 (2006).

-1-

At the relevant times, Chatman was the property manager at one of FHC's facilities, Ford was Chatman's assistant, and Tullar was the Compliance Director, which she described as "manager or supervisor of all the managers." We note as an initial matter that plaintiffs only nominally contend on appeal that *all* of the improprieties found in the Coleman file were fictitious. Each of the plaintiffs in their depositions asserted, in summary, that they either did nothing wrong or had not been aware at the time that they had done anything wrong, but only directly challenged a few of the investigation's findings. On appeal, however, plaintiffs do not seek to establish that the findings of the independent report were false so much as establish that there was at least a genuine question of fact that they were pretextual.[1] We therefore do not need to engage in a lengthy discourse on the nature of the improprieties found. Very generally, Coleman was found to have been improperly given an assortment of special treatments, including eligibilities and payment reductions, to which he was not entitled; and his file was missing an assortment of mandatory supporting documentation. Plaintiffs contend that if they did anything improper, so did various other employees who were never disciplined.

To make out a prima facie case under the WPA, plaintiffs must establish that they were engaged in a "protected activity," that they were discharged, and, critically, that there was a causal connection between the protected activity and being discharged. *Chandler v Dowell Schlumberger, Inc*, 456 Mich 395, 399; 572 NW2d 210 (1998). Plaintiffs contend that they have both direct evidence that they were unlawfully retaliated against, see *McNeil-Marks v Mid-Mich Medical Center-Gratiot*, ___ Mich App ___, ___; ___ NW2d ___ (2016) (Docket No. 326606); slip op at 8, and indirect evidence that defendants were unlawfully motivated and terminated plaintiffs because of that motivation. *Debano-Griffin v Lake Co*, 493 Mich 167, 176; 828 NW2d 634 (2013). If a plaintiff makes out a prima facie case, unlawful retaliation is presumed unless the employer rebuts it by offering a legitimate and non-discriminatory reason for the discharge. *McNeil-Marks*, ___ Mich App at ___; slip op at 8. If the employer does so, the plaintiff must then show that a reasonable trier of fact could find the reasons articulated by the employer to be mere pretext. *Hazle v Ford Motor Co*, 464 Mich 456, 465-466; 628 NW2d 515 (2001).

Clearly, there is no dispute that plaintiffs were discharged. Furthermore, while not necessarily conceding the truth thereof, plaintiffs apparently do tacitly concede that defendants' proffered reasons for the discharge, if believed, would constitute legitimate and non-discriminatory reasons for discharging them. We would, in any event, reject any argument that the improprieties found would not constitute proper reasons for discharge. Finally, plaintiffs argue that they were discharged for participating in the investigation into their own alleged misconduct, which is novel and creative but not persuasive, at least under the circumstances of this case. The investigation was into plaintiffs' *own* conduct, and if they were discharged on the

---

[1] At oral argument, plaintiffs' counsel expressed a blanket denial that plaintiffs engaged in *any* impropriety. This does not establish a genuine question of fact. See *McCart v J Walter Thompson USA, Inc*, 437 Mich 109, 115; 469 NW2d 284 (1991).

basis of their participation in that investigation, it was because of the investigation's findings.[2] Plaintiffs' argument is that defendants' proffered reasons for discharging them were mere pretext.

Plaintiffs argue that they were really terminated because they reported that *defendants* were violating various laws, rules, and regulations; including, allegedly, reporting defendants' misconduct during the investigation into their own. We have examined the voluminous list plaintiffs provided to the trial court of such alleged reports, and we find that plaintiffs take a good deal of liberties with the term.[3] Plaintiffs repeatedly assert that they advised defendants that the latter needed to comply with certain laws, rules, and regulations; plaintiffs' citations to their depositions, however, contain no hint that defendants in fact *were not* complying. Rather, plaintiffs believed that *they* were *in* compliance and, at the most, they advised defendants that certain actions *would be* noncompliant if they occurred. In their depositions, Chatman and Ford expressly stated that they had not reported, nor were they about to report, any violation of the law to anyone, and the only investigation in which they participated was the investigation into their own activities, which they contended were neither illegal nor improper.

Tullar asserted that she had reported to Clark that personnel director Paulette Wazny was "paying out" sick and vacation time to employees in violation of the procedures in the FHC handbook,[4] and she had also used FHC funds to pay for a pair of jeans for an employee; that temporary employees were being paid for days off in violation of FHC policy; and that FHC employee Christionne Reid was not allowed to take resident files from FHC property, even to send them to the United States Department of Housing and Urban Development (HUD).[5] Tullar also reported harassment by Wazny to Clark in the late summer of 2013.[6] According to Tullar, her reporting these issues resulted in her termination from employment, because a few weeks prior to her termination, she told Clark that if the issues were not addressed, she would report them to an outside entity. Additionally, Tullar repeatedly complained about how an incident involving an employee using a racial epithet was handled, which forms the basis of plaintiffs'

---

[2] Tullar also references an "investigation" she undertook at the behest of *her underlings* for the purpose of resolving a question they had. This is in no way the kind of "investigation" protected by the WPA.

[3] We commend the trial court's valiant efforts to obtain from plaintiffs a coherent, concise, and calm recitation of the actual evidence, with references to such actual evidence, in support of their allegations.

[4] Tullar admitted that she accepted some of those payments despite their impropriety because everyone else was doing likewise.

[5] We note that there is no evidence that any such files actually *were* removed, and it appears that Tullar only told her underlings that it *would* be improper *if* they did so; her testimony indicates that she did mention her conversations about the files to Clark.

[6] However, she opined that Wazny's harassment, as opposed to her alleged policy violations, did not play a role in her termination.

CRA claim, and she told Clark that if a lawsuit was filed regarding that incident, she would tell the truth.

Clearly, the evidence in no way supports any activity directly engaged in by Chatman or Ford that would be "protected" under the WPA. There is at least a genuine question of fact whether Tullar engaged in any such protected activity, even though some of her allegedly protected activities are highly doubtful. Because Tullar contends that she made those reports "on behalf of" Ford and Chatman, we will give plaintiffs the benefit of the doubt that there is also a question of fact as to all three of them. See MCL 15.362 (protecting reporting by an "employee, or a person acting on behalf of the employee"). However, plaintiffs must establish a "causal nexus" entailing "[s]omething more than a temporal connection between protected conduct and an adverse employment action." *West v Gen Motors Corp*, 469 Mich 177, 184-186; 665 NW2d 468 (2003). We also note that Reid was apparently uninvolved in the decision to terminate plaintiffs, and we are unable to discern from plaintiffs' brief any assertion that she had any influence thereon; consequently, the trial court unambiguously correctly found no possible WPA claim against Reid.[7]

Plaintiffs properly recognize their need to establish more than temporal proximity and argue that a causal nexus is demonstrated by (1) plaintiffs' favorable employee evaluations prior to their protected activity, followed by a decline in those evaluations; (2) the allegedly narrow focus of the investigation into only those individuals who engaged in the protected activity; (3) defendants' alleged selective enforcement of rules regarding the Coleman file, when other employees were not punished for similar improprieties; (4) defendants' expressed irritation with plaintiffs' protected activity; and (5) plaintiffs' contention that defendants lied about the extent of Wazny's involvement in the investigation. In the trial court, plaintiffs also contended that the investigation was conducted in an unfair manner because they were not allowed to bring supporting documentation with them, and furthermore that defendants were in violation of the law rather than plaintiffs. Most of these are simply contextual support, but the gravamen of plaintiffs' theory appears to be that they did nothing wrong, so when their termination is viewed in light of that supporting context, defendants were clearly motivated to terminate plaintiffs to keep plaintiffs from making reports to outside entities.

We note that Tullar's deposition testimony indicates that most of the violations of which she was concerned were departmental policies established by Clark, or in the case of purchasing jeans for an employee, a violation of a union contract provision mandating that anything provided to one employee must be provided to all. Whether these rise to the level of "a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state [or] a political subdivision of this state," MCL 15.362, is doubtful. Nevertheless, we choose not

---

[7] Furthermore, the evidence, notwithstanding plaintiffs' insistence on the significance of Wazny having some involvement in the internal investigation based on an email that does nothing more than enumerate the dates of plaintiffs' employment, does not support any conclusion that Wazny had any ability or authority to influence the termination decision. For the sake of argument we will nevertheless presume that Wazny may have had some influence nonetheless.

to decide that question, and giving plaintiffs the maximum benefit of the doubt, plaintiffs' claims fundamentally depend on their contention that they did nothing wrong and defendants found Tullar's inquiries bothersome, so defendants *must* have discharged plaintiffs due to the reporting or threatened reporting.

Plaintiffs have presented no evidence whatsoever aside from their subjective beliefs that would directly show that defendants decided to terminate plaintiffs' employment because of their alleged reporting, or threats to report, violations of laws or rules. However, plaintiffs *may* have articulated a possible motive on defendants' part, however speculative, so again giving plaintiffs the maximum benefit of the doubt, we will presume they have indirectly shown some causal link between their reporting of alleged violations of laws or rules and their termination.[8] A prima facie case may be made out if a factfinder could infer unlawful retaliation. *Debano-Griffin*, 493 Mich at 176. There can be no serious dispute that defendants have articulated a legitimate, non-discriminatory reason for the terminations in the results of the investigation. Therefore, plaintiffs must show that the evidence could still "permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff." *Hazle*, 464 Mich at 465 (quotation omitted).

We find plaintiffs' attempted refutation of the contents of the investigation tenuous at best.

> A plaintiff can establish that a defendant's articulated legitimate . . . reasons are pretexts (1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision. [*McNeil-Marks*, slip op at 8, quoting *Feick v Monroe Co*, 229 Mich App 335, 343; 582 NW2d 207 (1998).]

In a nutshell, plaintiffs contend that they did nothing wrong and could have proven that they did nothing wrong had they been given the chance to do so. As the trial court found, plaintiffs did make some statements to the general effect that they could establish the propriety of *a few of* the long list of improprieties found by the investigation. Again giving plaintiffs the very maximal benefit of the doubt, we presume they can. As the trial court found, they have nevertheless not refuted most of those findings, nor is there any non-speculative evidence other than plaintiffs' counsel's rather strongly-expressed feelings that plaintiffs actually *were* terminated for any reason other than those findings.

---

[8] We note, however, that a number of the alleged reports seem, from what we can discern, to amount to complaints to Clark that Clark was violating internal policies that Clark had implemented. Assuming we have understood the testimony correctly, we are skeptical that this constitutes protected activity under the WPA as opposed to activity more in the nature of back-seat driving. But as noted, we decline to decide that issue and extend to plaintiffs the benefit of the doubt.

In summary, although we find that plaintiffs may have made out a prima facie claim under the WPA, defendants have provided a legitimate and non-discriminatory reason for plaintiffs' discharge, and plaintiffs have not shown that reason to be pretextual. We therefore affirm the trial court's dismissal of plaintiffs' WPA claims.

Plaintiffs also contend that the trial court should not have dismissed their CRA claims. We disagree.

Similarly to WPA claims, a claim alleging racial discrimination in violation of the CRA can be supported by either direct or indirect evidence. *Hazle*, 464 Mich at 462. If direct evidence is not available, a plaintiff can use the framework set forth in *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973), to establish a prima facie claim, from which the trier of fact could draw the inference that the plaintiff was unlawfully discriminated against. *Hazle*, 464 Mich App at 462-463. If the plaintiff does so, the burden shifts to defendants to put forth a "legitimate, nondiscriminatory reason" that justifies its employment decision, allowing defendant to rebut the presumption of discrimination that arises after a prima facie claim is made out. *Id.* at 464. Then, plaintiffs must establish that the record evidence, viewed in the light most favorable to plaintiffs, would allow a reasonable factfinder to determine that "discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff." *Id.* at 465 (quotations and citation omitted).

A prima facie claim of unlawful retaliation under the CRA requires:

> "a plaintiff must show (1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." [*Rymal v Baergen*, 262 Mich App 274, 300; 686 NW2d 241 (2004), quoting *DeFlaviis v Lord & Taylor, Inc*, 223 Mich App 432, 436; 566 NW2d 661 (1997). (Citations omitted in original.)]

Plaintiffs must also show that their participation in activities protected by the CRA was "'a significant factor'" in their employer's adverse employment action, beyond merely having some causal link between the two. *Rymal*, 262 Mich App at 303, quoting *Barrett v Kirtland Community College*, 245 Mich App 306, 315; 628 NW2d 63 (2001). A prima facie case of a hostile work environment requires a plaintiff to show that they belonged to a protected class, that they received unwelcome and adverse conduct or communication on the basis of membership in that class, that the unwelcome conduct or communication "created an intimidating, hostile, or offensive work environment," and respondeat superior. *Haynie v State*, 468 Mich 302, 307-308; 664 NW2d 129 (2003). Determining whether the above elements of a prima facie case have been met is guided by the benchmark of "reasonableness[,]" and is "accomplished by objectively examining the totality of the circumstances[.]" *Chambers v Trettco*, 463 Mich 297, 319; 614 NW2d 910 (2000).

Plaintiffs' CRA claims are based on a single incident during which an employee, SD, went on a rant laced with racial epithets, which none of plaintiffs actually witnessed and defendants' subsequent allegedly improper response to that incident. A witness to the outburst,

-6-

LP, reported it to Tullar, who reported it to Wazny. Defendants investigated the incident and held a number of meetings. Eventually, a non-harassment seminar was held, and both SD and LP received "documented supervision letters," the latter because he had spoken to someone other than his direct supervisor when reporting the incident. SD was not otherwise disciplined, and LP's letter was eventually removed from his file when he protested. At some point during the investigation, SD was temporarily placed on paid administrative leave. Plaintiffs claim they were rudely rebuffed by Wazny when inquiring into the status of the investigation, which they believe was inadequate in various ways. Tullar also claims that she discussed the possibility of LP filing a lawsuit against the FHC, whereupon she stated that she would tell the truth. Ford claims that Wazny was predisposed against African-Americans and was frequently aggressive and unpleasant toward her.

Plaintiffs' unlawful retaliation claims appear premised on the conclusion that defendants held racial animosity toward them. Plaintiffs' haphazard presentation appears to begin with that conclusion and work backwards to finding facts to justify it. We note that Chatman testified that she had no involvement in the matter, and as noted, Reid was uninvolved in the decision to terminate plaintiffs' employment. Furthermore, threatening to "tell the truth" about a matter that clearly was not a secret does not seem to be a viable threat. Nonetheless, even if we presume that plaintiffs made out a prima facie case of unlawful retaliation, defendants have set forth a legitimate business reason for terminating plaintiffs' employment, and plaintiffs have not shown that reason to be pretextual.

Furthermore, the evidence unequivocally shows that Clark and Wazny, when made aware of the incident and the seriousness of an employee making a racial slur in the workplace, took concerted action to investigate the matter, impose a consequence on the employee involved, and to make available training for all staff. Plaintiffs apparently took issue with the rate of progress and the ultimate outcome, but all they have shown is, at the most, that their inquiries and commentary thereon proved irritating. The evidence may conceivably show some animosity, but it does not establish *racial* animosity. Put simply, there is simply no record evidence to support plaintiffs' assertion that discrimination on the basis of race "made a difference in the contested employment decision." *Hazle*, 464 Mich at 466 (citation omitted).

A CRA claim of a hostile work environment generally cannot be sustained unless the plaintiff proves "that the employer failed to take prompt and adequate remedial action upon notice of the creation of a hostile work environment." See *Chambers*, 463 Mich at 312. Reading between the lines of the deposition testimonies, the FHC may well have been an exceedingly stressful place to work and plagued by a certain amount of interpersonal strife. We do not hold that such conditions are desirable, but the CRA refers to a negative work environment specifically because of unwelcome conduct based on a protected class. Defendants clearly did undertake prompt remedial action here, and defendants' disagreement with the nature of that action is insufficient to establish that it was inadequate.

In closing, we note that at oral argument, plaintiffs raised three cases, only one of which was listed in their briefs, another of which had in fact been overturned on appeal to our Supreme Court, and the third of which is unpublished. In any event, plaintiffs attempted to extrapolate from those cases far more than is warranted by the evidence in the record here by taking a single fact out of each of those cases and viewing it independent of its context.

-7-

In *Pace v Edel-Harrelson*, 309 Mich App 256; 870 NW2d 745 (2015), rev'd 499 Mich 1 (2016), which was not in plaintiffs' briefs, this Court held that an employee who reported a suspected future violation of the law was protected under the WPA, which our Supreme Court reversed. Presumably, plaintiffs rely on this Court's observation that if the defendants had wholly invented an untrue incident as a basis for firing the plaintiff, the act of doing so would strongly indicate pretext. *Pace*, 309 Mich App at 271. Our Supreme Court did not comment on that point, so we presume it is still "good law." Nevertheless, we find it difficult to ascertain from plaintiffs' arguments, which rely more on emotions than a coherent presentation of record evidence, exactly what plaintiffs factually dispute. Notwithstanding the assertion at oral argument that they essentially deny everything, a blanket, bald denial is not the same as providing evidence that there is some real factual dispute for trial. See *McCart v J Walter Thompson USA, Inc*, 437 Mich 109, 115; 469 NW2d 284 (1991).

In *Landin v Healthsource Saginaw, Inc*, 205 Mich App 519; 854 NW2d 152 (2014), which plaintiffs properly cited in their briefs, the plaintiff, a nurse working at a hospital, asserted that he had been wrongfully terminated in retaliation for reporting that a co-worker violated certain policies; notably, after making his report, the co-worker reported that the plaintiff had violated the same policies, which the plaintiff admitted to violating. The co-worker, however, was not also terminated. This Court found a question of fact whether a causal connection might exist between the plaintiff's report and his termination. *Landin*, 205 Mich App at 534. As defendants point out, plaintiffs have introduced no coherent evidence into the record that we can find tending to show that any other employees did, in fact, violate similar rules without consequences. Even if any other employees did violate rules, it appears plaintiffs only arguably "reported" such violations in response to the investigation against them. Plaintiffs' attempt to analogize Landin is baseless.

Finally, in *Glover v Pontiac Housing Comm*, unpublished opinion per curiam of the Court of Appeals, issued December 30, 2008 (Docket No. 281737), the relationship between the plaintiffs and a highly influential and powerful person within the plaintiffs' employer's power structure had been acrimonious from the outset, and there was evidence that it became substantially more so after the latter learned that the former had reported her to the police for an alleged impropriety. There was evidence that the latter individual heavily influenced the ultimate decision maker in the adverse employment action at issue, and in fact also went so far as to circulate "highly offensive and derogatory letters" regarding the plaintiffs throughout the community. Unpublished opinions of this Court are not binding. MCR 7.215(C)(1).[9] The evidence certainly suggests a certain amount of ambient interpersonal strain at the FHC, although it does not suggest any especially targeted individuals. Plaintiffs allege that they were threatened by threatened or treated shortly, however the latter appears to be an objection to the conduct of the investigation against them, and the former did not involve anyone with a demonstrated ability

---

[9] In addition to failing to list *Glover* in their briefs, plaintiffs' counsel did not attach a copy of *Glover* as required by this Court Rule.

to meaningfully influence the ultimate decision maker.[10]  The facts of this matter bear only the most superficial resemblance to the facts in *Glover*.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Michael J. Kelly
/s/ Amy Ronayne Krause

---

[10] As noted, plaintiffs make much of Wazny's minimal involvement, if it could even be called that, in the investigation.  See footnote 7, *supra*.  We find nothing in the record evidence to suggest that Wazny had the kind of influence *or* egregious level of animosity demonstrated in *Glover*.